## McShea v. City of Philadelphia

*Steven Angstreich* for plaintiffs.

*Michael Eichert* and *Christopher McCabe,* for defendant.

LEVIN, *S.J.,* December 31, 2004—Plaintiffs are a class of current and former employees of defendant, the City of Philadelphia, who, during the period 1987 through 1994, participated in the city's Employees' Deferred Compensation Plan, which was established in accordance

with Internal Revenue Code section 457. Plaintiffs claim in this action that the city was grossly negligent in managing the plan, which gross negligence constitutes a breach of the city's contract with the plaintiffs, as set forth in the plan documents. After hearing the evidence presented at trial by plaintiffs and the city, the court makes the following findings of fact and conclusions of law with respect to each of the plaintiffs' claims that the city's actions constituted gross negligence.

## I. THIRD-PARTY ADMINISTRATOR FEES PAID TO PUBLIC EMPLOYEES' BENEFIT SERVICES CORPORATION (PEBSCO)

### A. *Findings of Fact*

The plan was established pursuant to City Council Ordinance no. 996 on October 27, 1982.

On June 22, 1984, the city contracted with PEBSCO to serve as third-party administrator for the plan. Under that contract, PEBSCO earned an annual fee of 98 basis points on asset value plus $15 per plan participant.

Between 1984 and 1992, the contract between PEBSCO and the city was renewed and modified several times with the annual fee declining to 90 basis points on assets over $75 million.

When the city issued a request for proposals in 1988, PEBSCO's proposal contained the lowest annual fees.

In 1985, the total asset value of the plan was $1,237,000, and in 1992, it was $89,811,211.65.

Third-party administrators tend to charge higher fees when a plan is new because a new plan contains fewer

assets, and because the administrator incurs more costs to manage it than a mature plan.

## B. *Conclusions of Law*

The annual fees PEBSCO charged to the plan from 1984 through 1992 were high, but still reasonable.

The city was not grossly negligent, in breach of its contract with the plaintiffs, by agreeing that the plan would pay PEBSCO's annual fees, except as to the surrender fee set forth in section III below.

## II. PEOPLE'S UNIVERSAL LIFE INSURANCE POLICIES (PULIPS)

### A. *Findings of Fact*

#### 1. Commissions

PEBSCO began selling PULIPs to plan participants in 1987 and ceased doing so only when the insurance option was discontinued by the city in July 1992.

The plan documents required the city to obtain city council's approval of the contract under which PEBSCO would offer PULIPs as an investment product to the plan participants.

The city did not obtain city council's approval of the contract under which PEBSCO would offer PULIPs as an investment product to the plan participants.

PEBSCO's contract with the city prohibited PEBSCO from offering for sale any product which was not commission neutral.

PEBSCO's agents earned a high commission on the sale of PULIPs to the plan participants. The commission was equal to the first year of premiums paid by the plaintiffs, plus 5 percent of each yearly premium thereafter. PEBSCO continued to collect its full annual fee for plan administration without any offset for the commissions collected on the sale of life insurance.

The amount of commissions earned by PEBSCO's agents with respect to the sale of PULIPs to plan participants was approximately $1 million, as set forth in a letter of November 16, 1992, from the city's director of finance, Stephen P. Mullin.

PEBSCO never informed the plan participants that PEBSCO's agents earned a commission on the sale of PULIPs.

The plan participants were put on notice that PEBSCO's agents were earning commissions on the sale of PULIPs in 1993, when the city filed suit against PEBSCO in federal court.

## 2. Taxability

The plan participants paid the premiums for the PULIPs with pre-tax dollars, and the death benefits payable to the plan participants' beneficiaries were taxable, unlike traditional life insurance policies.

PEBSCO did not disclose to the plan participants before a new disclosure form was approved in 1991, that any withdrawal or payment of death benefits would be taxable as ordinary income under the universal life option.

There was no evidence offered by the city to prove when the new disclosure forms were first used. In fact, Cynthia Douglas testified that she was unaware of the taxability of the insurance benefits, although she was responsible for dealing with PEBSCO and their disclosures to the plan participants.

Disclosure of the taxability of the death benefits was contrary to the interest of PEBSCO's agents because it would have made it harder for them to sell the policies, on which they made commissions.

The testimony of plaintiffs' expert, Mr. Rosen, that the use of PULIPs in the deferred compensation plan was inappropriate and that they should not have been offered, was credible.

Mr. Rosen's use of the concept "buy term and save the difference" to set damages is rejected. Mr. Rosen's assumption that plan members would allot the same amount of money, buy the term insurance with the reduced premium, and save the additional amount by investment, is not realistic.

In 1993, after the sale of new policies was discontinued, when the city filed suit against PEBSCO in federal court, the plan participants were put on notice that the death benefits paid on the PULIPs would be taxed.

The testimony of the city's expert witness, Mr. McAlpine, that if the plan participants invested in PULIPs for 20 years or more, the tax consequences of such investment to the plan participants were not significantly better or worse than if they had purchased life insurance with after-tax dollars on which the death benefits were not taxable, was credible, but not relevant.

## B. *Conclusions of Law*

The PULIPs were not a suitable investment product for the plaintiffs and should not have been sold to the plaintiffs by PEBSCO.

PEBSCO's sale of PULIPs to the plaintiffs was a breach of PEBSCO's contract with the city, as the life insurance option was designed to produce significant commission income to PEBSCO's agents at a high cost to plan participants who purchased the policies.

The city was grossly negligent, in breach of its contract with the plaintiffs, when it failed to obtain city council's approval of the PULIPs as an investment product to be offered to plaintiffs.

The city was grossly negligent, in breach of its contract with the plaintiffs, by allowing PEBSCO to breach its contract with the city by selling PULIPs to the plaintiffs.

PEBSCO's disclosure, in 1991, to new policyholders of the taxability of the death benefits to be paid under the PULIPs, through use of new plan-related forms, was insufficient to put plaintiffs on notice that they had a claim against the city.

Plaintiffs' claim based on the taxability of the death benefits to be paid under the PULIPs is not barred by the four-year statute of limitations for contract actions.

Plaintiffs failed to sustain their burden of proving the amount of damages that they suffered as a result of the taxability of the death benefits to be paid under the PULIPs.

The four-year statute of limitations for contract actions does not bar plaintiffs' claim based on the improper

commissions earned by PEBSCO agents in connection with the sale of PULIPs to plaintiffs.

The plaintiffs suffered damages in the amount of approximately $1 million as a result of the commissions paid to PEBSCO agents in connection with the sale of PULIPs to plaintiffs.

## III. THE SURRENDER FEE AND THE ADVISORS' FEES

### A. *Findings of Fact*

In 1989, the city agreed, in its contract with PEBSCO, that PEBSCO would receive a surrender fee equal to 5 percent of certain plan funds if the contract was not renewed for at least one year beyond, or was terminated without cause before, June 23, 1992.

Although the city offered some justification for the surrender provision contained in the 1986 agreement between PEBSCO and the city, there was none given for including the surrender fee in the 1989 agreement. In fact, the surrender fee was contrary to the advice and assumptions of Angela Dowd Burton and Douglas Smith in recommending PEBSCO as the low bidder in the 1988-1989 request for proposals.

In early 1992, the city hired Manuel Stamatakis as an investment advisor to the city.

Acting as advisor to the city, Mr. Stamatakis hired the law firm of Pepper Hamilton & Sheetz (PHS) to research a means to avoid paying the surrender fee to PEBSCO.

On December 31, 1992, the city terminated the PEBS-CO contract for cause.

The city could have avoided liability for the surrender fee if it had continued PEBSCO's contract for one year.

On January 5, 1993, the city commenced litigation against PEBSCO in federal court in which the city claimed that PEBSCO had breached its contract and breached its fiduciary duty to the plan by, inter alia, selling PULIPs to the plan participants (the federal PEBSCO suit).

PEBSCO counterclaimed in the federal PEBSCO suit for the surrender fee of approximately $2.5 million.

As part of the settlement of the federal PEBSCO suit, PEBSCO agreed to waive the surrender fee, and the city agreed to pay PEBSCO $200,000. This sum was paid by the city, not the plan participants, and is not claimed as damages in this suit.

The plan documents require that all consulting and legal fees charged to the plan and the plan participants be disclosed to the plan participants.

The city subsequently had the new plan administrator, The Copeland Companies, charge Mr. Stamatakis' fees and PHS' fees to the plan without disclosing that fact to the plan participants.

Mr. Stamatakis' fees and PHS' fees that were charged to the plan amounted to $729,391.66.

## B. *Conclusions of Law*

The surrender fee was patently unreasonable.

The city was grossly negligent, in breach of its contract with the plaintiffs, by agreeing to the surrender fee in its contract with PEBSCO in 1989.

The fees to Mr. Stamatakis and PHS were the direct result of the agreement in 1989 to provide PEBSCO with a surrender fee.

The city was grossly negligent in breach of its contract with the plaintiffs by having Copeland charge Mr. Stamatakis' fees and PHS' fees to the plaintiffs without disclosing such fees to the plaintiffs.

As a result of the city's gross negligence, plaintiffs suffered damages in the amount of $729,391.66.

## IV. TRANSFER OF FUNDS TO CONSTITUTION LIFE

### A. *Findings of Fact*

On September 29, 1992, the city transferred $27,434,-962.38 in plan funds from Lincoln National Life Intermediate Participation Guaranties (IPGs) to Constitution Guaranteed Investment Contracts (GICs).

Constitution guaranteed a rate of 4.88 percent on the funds transferred to it. Lincoln was paying 6.8 percent on those funds and had guaranteed 6.25 percent through October 31, 1992 on the remaining $50 million of plan funds that it held.

The city did not undertake any analysis or put forth any justification for its decision to transfer the $27 million to Constitution.

The city did not obtain the approval of city council before contracting with Constitution to hold plan funds.

The city did not offer any proof that Constitution was accredited in Pennsylvania.

On November 19, 1992, Standard & Poor's downgraded Constitution's claims-paying ability from the contractually required A—minimum to BBB—.

On November 24, 1992, the city transferred $27,286,509.80 from Constitution to a State Street Bank and Trust Company account that did not earn any interest.

On December 4, 1992, the city transferred the $27 million from the State Street account into a John Hancock account earning 3.85 percent interest.

On January 4, 1993, the funds in the John Hancock account were invested in a GIC portfolio.

If the $27 million had not been transferred to Constitution and State Street, the plan participants would have earned $96,957.15 more in interest than they did from September 29, 1992 through January 4, 1993.

## B. *Conclusions of Law*

The city was grossly negligent in breach of its contract with the plaintiffs when it decided to transfer $27 million in investments to Constitution.

The city was further grossly negligent in breach of its contract with the plaintiffs when it held the $27 million for eight days in an account that did not bear any interest.

But for the city's gross negligence, the city would not have had to invest funds with John Hancock at the short-term rate of 3.85 percent.

As a result of the city's gross negligence, plaintiffs were damaged in the amount of $96,957.15.

## V. CHANGE OF INVESTMENT VEHICLES
## FROM IPGs TO GICs

### A. *Findings of Fact*

In the spring of 1992, approximately $77 million of the plan's funds were invested in Lincoln IPGs.

In 1992, Mr. Thomas Knox, the deputy mayor of Philadelphia, not the city's finance director as required under the plan, determined that IPGs were not an appropriate investment vehicle for the plan participants in light of the fact that interest rates were low and expected to rise.

Later in 1992, the city set up an ad hoc committee, which included the finance director Stephen Mullin and the treasurer Kathy Engbertson, to evaluate the plan's investment vehicles.

Based on the research conducted by members of the ad hoc committee, the committee recommended GICs as a more appropriate investment vehicle for the plan participants than IPGs in light of the fact that interest rates were low and expected to rise.

Lincoln offered a guaranteed 7.3 percent through 1994 if the city kept the approximately $77 million of the plan's funds invested in Lincoln IPGs.

On January 4, 1993, the city invested approximately $77 million of the plan's funds in a GIC portfolio.

After January 4, 1993, interest rates increased.

As a result of the subsequent increases in interest rates, the $77 million in plan funds that were invested in GICs earned approximately $3.5 million less in interest through

1994 than they would have if they had remained invested in Lincoln IPGs.

### B. *Conclusions of Law*

The city was not grossly negligent, and not in breach of its contract with the plaintiffs, when it invested the $77 million that it had removed from IPGs in GICs.

## VI. COPELAND'S FEES

### A. *Findings of Fact*

The city entered into a contract with Copeland, effective January 1, 1993, under which Copeland would act as third-party administrator of the plan for an annual fee of 45 basis points on asset value.

In 1992, the plan's asset value was $89,811,211.65, and in 1996 it had increased to $169,316,365.68.

### B. *Conclusions of Law*

The fees Copeland charged to the plan from 1993 through 1996 were reasonable.

The city was not grossly negligent in breach of its contract with the plaintiffs by agreeing that the plan would pay Copeland's fees.

## ORDER

And now, December 31, 2004, after trial without a jury in this matter, and in accordance with the findings of fact and conclusions of law issued contemporaneously herewith, it is hereby ordered that defendant, the City of

Philadelphia, shall pay to plaintiffs $826,348.81, plus the amount of the commissions that the agents of Public Employee's Benefit Services Corporation were paid in connection with the sale to the plaintiff class of People's Universal Life Insurance Policies.